UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
Greenville Division

| | |
|---|---|
| Controls Service Company of South Carolina, Inc., | )<br>)   C.A. No. 6:06-cv-02738-GRA<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>)   **SECOND AMENDED COMPLAINT** |
| Alcoa Fujikura Ltd., AFL Telecommunications, LLC, and Jeffrey C. Lindsey, | )   **Jury Trial Demanded**<br>)<br>)<br>) |
| Defendants. | ) |

Plaintiff, by its attorneys, for its Second Amended Complaint against Defendants, alleges:

## JURISDICTION AND VENUE

1.      This is a civil action seeking damages and injunctive relief for various causes of action including copyright infringement under the copyright laws of the United States (17 U.S.C. § 101 *et seq.*).

2.      This Court has jurisdiction under 17 U.S.C. § 101 *et seq.*; 28 U.S.C. § 1331 (federal question); and 28 U.S.C. § 1338(a) (copyright).

3.      The Court has personal jurisdiction over the Defendants, and venue in this District is proper under 28 U.S.C. § 1391(b) and 28 U.S.C. § 1400(a), in that the Defendants reside in the District (see 28 U.S.C. § 1391(c)), and the acts of infringement complained of herein occurred, at least in part, in this District.

## THE PARTIES

4.      Plaintiff Controls Service Company of South Carolina, Inc. ("CSC" or "Plaintiff"), is a South Carolina corporation based in Greenville County, South Carolina. It is in

1

the business of designing, developing, manufacturing, and maintaining building controls, energy management systems, and remote site and emergency generator monitoring and alarms systems.

5. Defendant Alcoa Fujikura Ltd. ("Fujikura") is a Delaware corporation doing business in this district. Its registered agent for service of process is Corporation Service Co, located at 5000 Thurmond Mall Blvd, Columbia, SC 29201.

6. Defendant AFL Telecommunications, LLC, is also a Delaware corporation doing business in this district. Its registered agent for service of process is CT Corporation System, located at 75 Beattie Place, Greenville, SC 29601.

7. AFL Telecommunications, LLC, upon information and belief, is a newly-created and wholly-owned subsidiary of Fujikura Ltd. of Japan. Hereinafter, Fujikura and AFL Telecommunications, LLC, will together be referred to as "AFL."

8. Defendant Jeffrey C. Lindsey ("Lindsey") is an individual and resident of this District.

**BACKGROUND FACTS**

9. In 2001, at a meeting between CSC and its client Charter Communications concerning building controls and energy management systems, CSC was asked by Charter if it had experience in remote site and emergency generator monitoring and alarm systems ("remote monitoring systems").

10. CSC did and answered affirmatively. Charter asked CSC to contact AFL on this subject since AFL would soon be bidding to construct remote enclosures and cable installations for Charter, known as "hubs" and "front-end systems."

11. CSC contacted AFL and was told that AFL was in the process of selecting a remote monitoring system. CSC met with AFL to determine the capabilities needed in this

2

context. Shortly thereafter CSC returned and presented a rough draft of the proposed system including preliminary schematic drawings and system operational parameters, along with a budget for the system. CSC also built a "Demo" unit and gave a demonstration of its capabilities to AFL and Charter at AFL's facility in Duncan, SC.

12.     Thereafter, AFL notified CSC that it wished to proceed with marketing the CSC remote monitoring system (the "System" or the "Monitoring System" or "Scout"). CSC agreed to allow AFL to name the system "Scout."

13.     In March 2002, on information and belief, AFL raised with CSC the issue of "formalizing our agreement" regarding the "facility monitoring product" (the System). In a memorandum to CSC, AFL asked CSC to consider various points and get back with his response so that a memorandum of understanding could be drafted and they could "rock and roll." (See Exhibit 1.)

14.     Along with various other points, AFL asked: "Can we get an agreement with CSC that gives AFL rights to the CATV market with the product?" (*Id.*)

15.     CSC responded: "CSC will give AFL rights to market the monitoring package to the CATV market with the product. (Bi-directional type)." (*Id.*)

16.     AFL also asked: "Are we in agreement that this product will be a AFL/CSC installed product only? In other words we will not allow anyone to order the unit and self install. Confirm?" (*Id.*)

17.     CSC replied: "Yes—This product/package will be considered by CSC as an AFL/CSC installed product, only. CSC will not sell this package directly to customer or indirectly to customers. This clause needs to be formal between CSC/AFL and bi-directional." (*Id.*)

18.     By May, the commercial launch of the Scout System was imminent. With CSC's help and guidance, AFL had completed marketing and sales literature and a press release. AFL planned to issue the press release just before the opening of an industry trade show in June 2002.

19.     With respect to the issue of an agreement, in an email dated May 23, 2002, AFL, following up on the exchange referenced above, proposed the following agreement:

> CSC agrees that <u>AFL has the sole rights to the Scout product as developed and recognizes such as an AFL produced as packaged</u>.
> CSC agrees that <u>AFL will have sole rights to market and sell Scout into the Broadband Industry</u>.
>
> CSC will be responsible for all manufacture of the Scout product.
> <u>AFL agrees that CSC will be the sole source of manufacture for the Scout product</u>.
>
> AFL agrees that CSC will provide labor as required for site installations throughout North America. Product lead times will be as follows: 1 to 10 units @ 4 weeks / 11 to 25 units @ 6 weeks.
>
> CSC agrees to notify AFL in writing of any changes to lead times. Partial shipments can be arranged with advance notice to CSC. Emergency shipments can be arranged with notice to CSC and can be typically turned around in 8 days (two Scout units).
>
> CSC agrees to hold common parts in inventory. Enough to built two complete units. Finished goods will be drop shipped from CSC's Greenville SC facility directly to AFL project sites or as directed by appropriate AFL personnel.
>
> <u>All agree that the Scout product will not be directly sold as package to others and that it will be represented as an engineered / installed by AFL</u>.

(Exhibit 2 hereto, at 3-5, emphasis added.)

20.     In a reply email, CSC accepted those terms almost word for word. (Exhibit 2, at 1-3.) The reply email further addressed various issues which had been raised by the original memorandum from Bearden, e.g., the components and cost of the system. AFL did not object to additional points set forth by CSC.

4

21. In reliance on its understanding with AFL (in particular that, in return for allowing AFL to market the System, CSC would be the sole source of manufacture and installation), CSC built an operating model of the system and installed it in a remote-site enclosure that AFL was going to display at the trade show referred to above.

22. In further reliance, CSC provided an employee (Jeff Lindsey) to attend the show to assist in demonstrating the unit and provide sales support. CSC agreed that the CSC employee would identify himself as part of AFL's "Scout Team" and would not be identified as an employee of CSC.

23. The Scout System was well received at the Cable Tec show, and soon thereafter, Charter Communications selected the Scout System as its remote monitoring system of choice. Also soon thereafter, CSC supplied AFL with portable "Demo" system for AFL to take to customer sites in marketing the System.

24. As a result of Charter's selection and in continuing reliance on its understanding with AFL as referenced above, CSC (as a subcontractor to AFL) built, programmed, shipped, installed, and started-up Systems at various Charter sites in New York, Connecticut, New Hampshire, Massachusetts, and Vermont, as well as in North and South Carolina and in St. Louis. This work took place mainly in the last quarter of 2002 and the first quarter of 2003.

25. The parties had various discussions over a number of months in 2002 regarding entering into a more formal agreement that would have given additional rights to AFL. No other agreement was ever entered into.

26. At all times, however, it was understood that CSC had all "design, engineering and documentation rights" to the system and AFL had no right to use, reproduce or sell the system except as permitted by CSC.

27.     For example, Section 18 of the last proposed draft (which came from AFL), dated October 23, 2002, stated explicitly as follows: "CSC agrees and recognizes that AFL has the sole rights to the Scout product as developed by CSC for AFL. CSC agrees that AFL will have sole rights to market and sell Scout into the Communications Industry. <u>AFL also agrees that the design, engineering and documentation rights of the system are the property of CSC and will not be used, reproduced, or sold by AFL except as permitted herein</u>." (Emphasis added.)

28.     Section 23(F) of the same draft stated: "AFL will have an unlimited right to publish, use, duplicate or disclose Information concerning the Scout Package in <u>marketing efforts</u> to its clients, and all trademarks and/or copyrights in Information will be the sole and exclusive property of AFL as it pertains to the Scout brand. AFL agrees that <u>CSC shall have exclusive ownership of the engineering design, and retains rights to the software and graphics generation included in the Scout System</u>." (Emphasis added.)

29.     During or after completing the work for Charter, CSC was requested by AFL to provide quotes on the System for many other companies and entities.

30.     CSC provided such quotes, but AFL did not make the sales. CSC was unable to understand how AFL was unable to sell the System when it (the System) had been so well received generally and was doing so well for Charter. Indeed, the System continued to be identified by Charter as its system of choice for all of its remote locations.

31.     Eventually, CSC learned that AFL was marketing and selling the system behind CSC's back.

32.     At the end of September 2003, Lindsey left CSC. CSC learned later that Lindsey had been hired by AFL to market the Scout System. During the period of time he was employed

6

by AFL, Lindsey acted within the course and scope of his employment and, under the doctrine of respondeat superior, AFL is therefore responsible for his actions.

33. Upon information and belief, Lindsey provided to AFL various CSC confidential, proprietary and trade secret information relating to the System including programming, documentation, and design drawings. AFL induced Lindsey to do this and/or knew or should have known that he was providing and/or using on AFL's behalf confidential, proprietary and trade secret information of CSC relating to the System.

34. AFL had met with Lindsey, upon information and belief, had met with each other and with Siemens Building Technologies, Inc. ("Siemens") – see next paragraph – prior to Lindsey's departure from CSC to discuss all of this as well as how AFL could take over CSC's Dealer Agreement with Siemens.

35. On October 20, 2003, CSC's Dealer Agreement with Siemens Building Technologies, Inc. ("Siemens"), was terminated by Siemens. The termination did not affect CSC's ability to manufacture and/or install the System since CSC could obtain the relevant Siemens component through other sources or, as designer/developer of the System, could switch to another manufacturer's product for that portion of the System.

36. AFL did not have such expertise. Accordingly, as CSC later learned, AFL, almost immediately after CSC was terminated, entered into a non-disclosure agreement with Siemens and had its personnel undergo two days of Siemens training. And, as CSC has also since learned, approximately a month later, AFL formally became a Siemens dealer and obtained the right to purchase the relevant Siemens component directly.

37. Over the next several years, upon information and belief, AFL marketed and sold hundreds, if not thousands, of Scout Systems, using companies other than CSC to manufacture,

install and service the systems. Each of these systems, upon information and belief, was either identical to or based on the System designed by CSC.

38.     In connection with marketing, installing and servicing the System without CSC, defendants utilized and made hundreds, if not thousands, of copies of (and/or derivative works based on) CSC proprietary or trade secret information including software programming, engineering diagrams, documentation, Powerpoint presentations, and so forth, components of which have been submitted to the United States Copyright Office (along with application, deposit, and fee) for registration of copyright consistent with 17 U.S.C. § 411(a).

39.     When AFL became a dealer for Siemens, AFL and Siemens projected sales by AFL of the Siemens component used in the System in 2004 of over $1,000,000, in 2005 of over $2,000,000, and in 2006 of over $3,000,000. Based on the cost of the Siemens component, this would equate to roughly 400 Scout systems in 2004, and 800 in 2005, and 1200 in 2006.

40.     CSC's profit on the manufacture and installation of each System was approximately $5,000. Hence, based on the AFL/Siemens projections alone, and without consideration of ongoing and ancillary revenues (e.g., maintenance and support), CSC should have earned profits from AFL's sales of the System in the range of $12,000,000 simply through 2006. CSC was prevented from earning those by defendants' actions including AFL's failure or refusal to comply with its obligation to have CSC manufacture and install all Systems.

41.     In addition, CSC would have stood to earn the same amount or even more through 2006 on an on-going basis for service and support of the System at all installed locations.

42.     Further, had AFL properly marketed the System and committed appropriate resources as was expected in return for exclusive rights to the CATV market, demand for the System would have been enormous, at least consistent with AFL and Siemens' projections

through 2006 and ramping up well that after 2006. This would have lead to additional profits for CSC through 2006 and beyond.

43.     Indeed, had AFL not essentially sabotaged the business, CSC would have continued to earn substantial profits on the System, and would have earned additional profits on ancillary services and related products and spin-offs for many years.

## COUNT I
## Copyright Infringement
## All Defendants

44.     Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

45.     Defendants' actions as alleged in this complaint constitute infringement of Plaintiff's copyrights in violation of the Copyright Act, 17 U.S.C. § 101 et seq., and the infringement was willful.

46.     Plaintiff has been damaged as a proximate result of these actions and is entitled to actual and punitive damages in an amount to be determined by a jury.

## COUNT II
## Contributory Infringement
## All Defendants

47.     Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs.

48.     Defendants actions have enabled, induced, caused, and/or materially contributed to other persons or entities (e.g., entities to whom AFL sold the System without CSC's authorization) making unlawful copies of Plaintiff's copyrighted information and thereby infringing upon Plaintiff's copyrights.

49. Defendants' actions as alleged in this complaint constitute contributory infringement in violation of the Copyright Act, 17 U.S.C. § 101 et seq., and the infringement was willful.

50. Plaintiff has been damaged as a proximate result of these actions and is entitled to actual and punitive damages in an amount to be determined by a jury.

## COUNT III
### Misappropriation of Trade Secrets
### All Defendants

51. Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

52. Some or all of the CSC information that Defendants utilized in marketing, manufacturing, installing and servicing the System without CSC constituted trade secrets as that term is defined in the South Carolina Trade Secrets Act, S.C. Code Section 39-8-10 et seq.

53. The information was acquired by improper means.

54. Some of it had been acquired by AFL from CSC when they were working together under conditions of confidentiality and limited rights of use. On information and belief, additional trade secret information was taken from CSC by Lindsey to AFL, at the inducement of AFL, when he went to work for AFL.

55. Such acts constitute misappropriation of trade secrets in violation of the South Carolina Trade Secrets Act, S.C. Code Section 39-8-20 *et seq*.

56. Plaintiff has been damaged as a proximate result of these actions and is entitled to actual damages in an amount to be determined by a jury.

57.	Further, the acts of misappropriation constituted a willful, wanton, or reckless disregard of Plaintiff's rights, and therefore Plaintiff is also entitled to recover additional, exemplary damages of two times its actual damages, as well as reasonable attorney's fees.

## COUNT IV
## Breach of Contract
## AFL

58.	Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

59.	The emails between AFL and CSC referenced above (Exhibits 1 and 2 hereto) constituted a contract between them in which, among other things, CSC gave AFL the right to market the System in return for CSC being the sole source for manufacture and installation of the System.

60.	Defendant AFL breached the contract as alleged in this complaint.

61.	Plaintiff has been damaged as a proximate result of these actions and is entitled to actual damages in an amount to be determined by a jury.

## COUNT V
## Breach of Contract Accompanied by Fraudulent Act
## AFL

62.	Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

63.	Defendant AFL's breach of the contract between it and CSC was done with fraudulent intent.

64.	The breach was accompanied by one or more fraudulent acts by AFL characterized by dishonesty in fact, unfair dealing, or unlawful appropriation of CSC's property including, for example, upon information and belief, misleading CSC regarding the nature of

their dealings, dealing unfairly with CSC and interfering with CSC's contract with Siemens, negotiating with Lindsey contrary to CSC's interest and while he was an employee of CSC and had fiduciary and other duties to CSC, misappropriating trade secret CSC information concerning the System and inducing defendant Lindsey divulge to AFL and use on behalf of AFL trade secret information, and infringing upon CSC's copyrights regarding information relating to the System.

65.     Plaintiff has been damaged as a proximate result of these actions and is entitled to actual and punitive damages in an amount to be determined by a jury.

## COUNT VI
## Fraud and/or Fraud in the Inducement
## AFL

66.     Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

67.     As already noted, CSC granted various rights and provided various services, products and information to AFL including, for example, the right to market the System, assistance in developing marketing materials, assistance in making sales presentations, agreement that CSC personnel would not identify themselves employees of a different company when exposed to potential AFL customers.

68.     CSC granted these rights and provided these services in reliance on certain AFL representations including, specifically, the representation that CSC would be the sole source of manufacture and installation.

69.     These representations were made by AFL to induce CSC to enter into the contract with AFL referenced above or, in the event it is found that there was no contract, to induce CSC

to provide the various rights, services, products, and information concerning the System alleged in this complaint.

70. These representations were false.

71. They were material to CSC's decision to enter into the contract or, in the event no contract is found to exist, to allow AFL to market the System and to provide information and services to AFL relating to the System.

72. AFL knew that the representations were false or recklessly disregarded their truth or falsity.

73. AFL intended that CSC rely on the representations.

74. AFL knew that CSC was ignorant of the falsity of the representations.

75. AFL knew that CSC was relying on the truth of the representations.

76. CSC was entitled to rely on the representations.

77. Plaintiff has been damaged as a proximate result of these actions and is entitled to actual and punitive damages in an amount to be determined by a jury.

### COUNT VII
### Intentional Interference with Contractual Relationship
### or Prospective Contractual Relationship
### AFL & Lindsey

78. Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

79. AFL and Lindsey were aware of the contract between Plaintiff and Siemens.

80. These Defendants intentionally interfered with Plaintiff's potential future contractual relations with Siemens, caused Siemens to terminate its agreement with Plaintiff, and did both with an improper purpose and/or by using improper means.

81. As to improper purpose, their desire was to illegally cut-out Plaintiff from the market for the System and to attempt to justify AFL not working with CSC even though AFL had no legal right to market, manufacture or install the System except to the extent authorized by CSC.

82. As to improper methods, Lindsey, while employed by CSC, supplied false and inaccurate information to Siemens and took various other steps including terminating important CSC employees, all to cause or justify Siemens terminating its agreement with CSC for the benefit of Lindsey and AFL.

83. AFL, upon information and belief, induced Lindsey to take some or all of these actions so that it could take over the Siemens agreement from CSC and would not have to rely on or utilize (or pay) CSC.

84. There was no legitimate justification for these actions.

85. Plaintiff has been damaged as a proximate result of these actions and is entitled to actual and punitive damages in an amount to be determined by a jury.

## COUNT VIII
## Unfair Trade Practices
## All Defendants

86. Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

87. The actions of Defendants alleged in this complaint constitute unfair or deceptive acts or practices in violation of S.C. Statute § 39-5-20 *et seq*.

88. These acts have the potential for repetition.

89. Plaintiff has been damaged as a proximate result of these actions and is entitled to actual damages in an amount to be determined by a jury, as well as its reasonable attorney's fees and costs.

90. Because Defendants' actions were willful and/or knowing, Plaintiff is entitled to recover an additional, exemplary damages of two times actual damages.

## COUNT IX
## Breach of Covenant of Good Faith and Fair Dealing
## AFL

91. Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

92. AFL's actions alleged in this complaint constitute a breach of the covenant of good faith and fair dealing.

93. Plaintiff has been damaged as a proximate result of these actions and is entitled to actual and punitive damages in an amount to be determined by a jury.

## COUNT X
## Civil Conspiracy
## AFL & Lindsey

94. Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

95. AFL and Lindsey combined together in improper actions alleged in this complaint for the purposes of injuring Plaintiff.

96. Plaintiff has been damaged as a proximate result of these actions.

97. In the event Plaintiff is not compensated for these damages pursuant to another cause of action, it is entitled to judgment for its actual and punitive damages in an amount to be by a jury.

**COUNT XI**
**Breach of Fiduciary Duty**
**AFL and Lindsey**

98. Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

99. The relationship between plaintiff and defendants was a fidicuary relationship. CSC imposed special confidence in them in order to work with them to develop and pursue the remote monitoring business for their mutual benefit.

100. Pursuant to this relationship, CSC provided defendants with its labor and expertise and various information (including trade secret information) including the design of the Scout system and other information relating to the design and implementation of Scout, as related above (including trade secret information).

101. CSC expected defendants to use this information only for the benefit of defendants and CSC together (as was the case with the installations of Scout which CSC performed for Charter).

102. Defendants actions as alleged in this complaint constitute a breach of their fiduciary duty to plaintiff. Each defendant contributed to the breach by the other defendant.

103. Plaintiff has been damaged as a proximate result of these actions and is entitled to actual and punitive damages in an amount to be determined by a jury.

WHEREFORE, Plaintiff prays for judgment as follows:

(A)   On Count I – Against Defendants jointly and severally for actual damages;

(B)   On Count II – Against Defendants jointly and severally for actual damages;

(C)   On Count III – Against Defendant's jointly and severally for actual damages, plus exemplary damages of two times actual damages, plus reasonable attorney's fees and expenses;

16

(D) On Count IV – Against Alcoa Fujikura Ltd. and AFL Telecommunications, LLC jointly and severally for actual damages;

(E) On Count V – Against Alcoa Fujikura Ltd. and AFL Telecommunications, LLC jointly and severally for actual and punitive damages.

(F) On Count VI – Against Alcoa Fujikura Ltd. and AFL Telecommunications, LLC jointly and severally for actual and punitive damages.

(G) On Count VII – Against Alcoa Fujikura Ltd., AFL Telecommunications, LLC, and Jeff Lindsey jointly and severally for actual and punitive damages.

(H) On Count VIII – Against All Defendants jointly and severally for actual damages, plus exemplary damages of two times actual damages, plus reasonable attorney's fees and expenses;

(I) On Count IX – Against Alcoa Fujikura Ltd. and AFL Telecommunications, LLC, jointly and severally for actual and punitive damages;

(J) On Count X – Against All Defendants jointly and severally for actual and punitive damages;

(K) On Count XI – Against All Defendants jointly and severally for actual and punitive damages;

(L) For recovery of all costs, attorneys' fees and expenses reasonably incurred in the prosecution of the instant action to the extent permitted by law;

  (M) For such other and further relief as the Court deems just and proper.

           ANDERSON & HERLONG, LLC

           _____
           William D. Herlong
           Fed Bar ID No 05223
           111 E. North Street [Zip 29601]
           P.O. Box 2105
           Greenville, SC 29602-2105
           (864) 255-9255
           william@andersonherlong.com

           Attorneys for Controls Service Company of South Carolina, Inc.

February 4, 2008

      **<u>PLAINTIFF RESPECTFULLY DEMANDS A JURY TRIAL</u>**